UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

OWEN D. MALONEY,                          )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )    Case No. 14-cv-30054-KAR
                                          )
BOARD OF TRUSTEES OF CLAPP               )
MEMORIAL LIBRARY, et al.,                )
                                          )
        Defendants.                       )


MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 41)
March 24, 2016

ROBERTSON, U.S.M.J.

I.      Introduction

        This case arises out of the March 7, 2011 resignation of the plaintiff, Owen D. Maloney

("Maloney" or "Plaintiff"), from his employment as Library Director at Clapp Memorial Library

(the "Library") in Belchertown, Massachusetts ("the Town").  Maloney alleges that he was

constructively discharged in retaliation for a statement he made on a matter of public concern in

violation of his First Amendment right to engage in free speech.  By his First Amended

Complaint, Plaintiff has asserted a claim against the Board of Trustees of the Clapp Memorial

Library (the "Board") and individual Board members Stephen S. Lanphear, Denise A. Smith,

William S. McClure, Kevin Weiss, Christine Walker, and Barbara Sullivan (collectively, the

"individual Defendants") for violation of his rights under 42 U.S.C. § 1983.[1]  Plaintiff also

_____

[1] Maloney originally included the Town and Ronald E. Aponte, Chairman of the Town Board of
Selectman and an *ex-officio* member of the Board, as defendants.  However, he dismissed his

brings a claim against the Board for breach of contract.[2]  The Defendants have moved for summary judgment on both counts of Plaintiff's complaint.

The parties have consented to this court's jurisdiction (Dkt. No. 32).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the following reasons, the court allows Defendants' motion.

II.   Statement of Facts

The Library was incorporated by Chapter 134 of the Massachusetts Acts and Resolves of 1887, "for the purpose of establishing and maintaining a public and social library for the diffusion of knowledge and to promote intellectual, moral and physical culture" in the Town (Dkt. No. 11, First Amended Complaint (hereinafter "FAC") at ¶ 2).  The governing board was to consist of between five and seven members, including the Chairman of the Board of Selectmen of the Town as a member *ex officio*.  Any vacancies on the Board were to be filled at such time and in such manner as directed by the corporation.  The Town was permitted to transfer real and personal property to the Library, including yearly disbursements for its expenses and maintenance.

During the time period relevant to this litigation, the Board was comprised of the six individual Defendants (FAC at ¶¶ 3-8; Dkt. No. 43, Concise Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (hereinafter, "CSUMF") at ¶¶ 3-8), along with Ronald Aponte, Chairman of the Board of Selectmen of the Town (FAC at ¶ 9; Dkt. No. 49-6, Affidavit of Owen D. Maloney (hereinafter, "Maloney Aff.") at ¶ 21).  Other than Aponte, who served *ex-officio*, all of the members of the Board were elected by the Board and all

---

action without prejudice as to the Town (Dkt. No. 13), and the parties stipulated to the dismissal of the action with prejudice as to Aponte (Dkt. No. 37).
[2] Maloney also asserted a claim under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H and 11I, but the parties have stipulated to its dismissal (Dkt. No. 48).

were volunteers (CSUMF at ¶ 11).  The Board was responsible for all personnel decisions with respect to the position of Library Director (CSUMF at ¶ 12).  Defendant Lanphear served as the Board president from 2004 through 2011 (CSUMF at ¶ 13).

Plaintiff was employed as Library Director from March 1, 1989, until April 11, 2011 (CSUMF at ¶¶ 9, 89; Maloney Aff. at ¶ 1).  All Library staff, including Plaintiff, were paid by the Town, received the same pay raises as other Town employees, were subject to the Town Personnel Handbook, and were participants in the Hampshire County Retirement System in which all Town employees participated (CSUMF at ¶ 10; Maloney Aff. at ¶ 3).

Library staff reported directly to Plaintiff (Maloney Aff. at ¶ 20).  Plaintiff did not believe every action he took to address patron behavior at the Library required Board approval (Maloney Aff. at ¶ 19).  Defendant Lanphear went to the Library often, typically three to four times per week (Maloney Aff. at ¶ 17; CSUMF at ¶ 14).  He and Plaintiff would discuss operational issues and, in 2008 and 2009, issues relating to obtaining library expansion grants and matching Town funds (Maloney Aff. at ¶ 17).

Plaintiff's last signed employment agreement with the Board is dated July 1, 2005, for the term commencing on that date and running through June 30, 2008 (the "Employment Agreement" or the "Agreement") (CSUMF at ¶¶ 18-19, Maloney Aff. at ¶ 4).  The fifth paragraph of the Employment Agreement is entitled "Performance Review," and contains three provisions.  The first provides for annual reviews of Plaintiff's job performance, to occur in June of each year and to be documented on the Library's performance review form, with one copy provided to Plaintiff and one copy placed in his personnel file (CSUMF at ¶ 19).  The only signed written performance review of Plaintiff is from 1997 (CSUMF at ¶ 22).  In 2009, the personnel advisory committee for the Library instructed Plaintiff to use the Town "Evaluation of

Performance" form to create a draft review, which he did, but it was never acted on or finalized (CSUMF at ¶ 41; Maloney Aff. at ¶ 11). The second provides for the Board to meet with Plaintiff six months before the start of each review period to "discuss performance and address issues and questions which may have developed since the last performance review meeting …. to ensure that both parties are in close communication so that misunderstandings do not develop and problems are addressed before they become serious" (CSUMF at ¶ 19). The third and final review provision states that, "[i]n the event that potentially serious performance problems are identified during the year, additional meetings *may* be scheduled in order to resolve them" (CSUMF at ¶ 19) (emphasis added). It allowed for the possibility of developing new performance goals, and, should "conditions warrant," placing Plaintiff on a six month probationary period (CSUMF at ¶ 19).

The eighth paragraph of the Agreement is entitled "Termination."  It provides in pertinent part that, "[t]he Board of Trustees may terminate the Agreement and remove the Library Director if necessary for cause by a 6/7ths vote of the Board after written notice and hearing" (CSUMF at ¶ 19).

On at least four occasions during Plaintiff's tenure as Library Director, he utilized profane language. The first was on September 28, 2007, when Plaintiff attended an annual meeting of the Friends of the Library ("FOL") (CSUMF at ¶ 23). After the meeting, Plaintiff and several members of the FOL, including its president, Wendy Campbell, retired to McCarthy's pub. There, Plaintiff and Campbell got into a verbal altercation, during which Plaintiff stated to Campbell, "Who the fuck do you think you are you sweet bitch?" (CSUMF at ¶¶ 24-28, 31). The Board initiated a formal investigation of the incident (CSUMF at ¶ 32).

Based on the findings, the Board reprimanded Plaintiff in writing dated November 13, 2007 (CSUMF at ¶ 34; Dkt. No. 49-18).

The three remaining incidents occurred during Plaintiff's final year of employment.  On June 15, 2010, Plaintiff used the word "fuck" at a Board meeting (CSUMF at ¶ 49).  The following month, on July 9, 2010, Plaintiff attended a prayer vigil for Mickey Brougham, a resident of the Town who had gone missing (CSUMF at ¶ 50; Maloney Aff. at ¶15).  At least 50 to 100 individuals, including children, attended the event on the Town Common (CSUMF at ¶ 50; Maloney Aff. at ¶ 15).  Attendees were given the opportunity to come up to a microphone and address the group.  Taking up the offer, Plaintiff recounted a time when Brougham used his backhoe to help dig a grave for Plaintiff's dog (CSUMF at ¶ 51; Maloney Aff. at ¶ 15).  Plaintiff summed up his words by saying, "He did this for a fucking dog" (CSUMF at ¶ 51).  Plaintiff apologized immediately thereafter and stepped away from the microphone (CSUMF at ¶ 51).  Plaintiff also apologized during the next Board meeting on July 19, 2010, for his use of the word "fuck" at the previous Board meeting (CSUMF at ¶ 49).

On July 26, 2010, Defendant Lanphear sent a letter to Plaintiff referring to his "use of profanity at Board meetings such as the one on June 15, 2010 and at public gatherings such as the prayer vigil for Mickey Brougham on July 9, 2010," as "unacceptable," "unprofessional and inappropriate behavior," further instances of which could "result in disciplinary action up to and including termination" (CSUMF at ¶ 56; Dkt. No. 49-20).

Thereafter, on February 18, 2011, Plaintiff, along with four staff members and three volunteers from the FOL, participated in a project to clean the Library primarily to alleviate clutter (CSUMF at ¶ 66).  Following a 90-minute lunch break during which Plaintiff consumed at least two beers, Defendant Sullivan arrived to join in the effort (CSUMF at ¶¶ 66, 69).

Plaintiff took issue with Defendant Sullivan moving a podium from one location to another and placing a dictionary on it, rather than moving it to the Library basement where he had designated it to go (CSUMF at ¶ 70).  According to Plaintiff, this was the first occasion during his tenure as Library Director when a Board member had come into the library and given direction to Library staff that contradicted his (Maloney Aff. at ¶ 20).  Thereafter, Plaintiff advised Defendant Sullivan, "You don't fucking know anything about libraries;" and "I do not like that Board, they don't fucking know what they are doing, they're archaic."  He also referred to Defendant Sullivan as a "stupid bitch," and characterized the Board's restrictions on the staff's consumption of food and drink on-site as "bullshit" (CSUMF at ¶¶ 71-73; Maloney Aff. at ¶ 20).  Defendant Sullivan, for her part, did not direct any swearwords at Plaintiff (CSUMF at ¶ 70).  The following day, Plaintiff sent an email to Defendant Sullivan in which he apologized for his "unpardonable behavior," admitted to being "disrespectful, insolent, and rude," and acknowledged that his note could not "excuse [his] actions" of the day before (CSUMF at ¶ 74).

On March 1, 2011, the Board met in executive session (CSUMF at ¶ 75).  On Aponte's motion (Dkt. No. 49-21), the Board voted unanimously to start the termination process with respect to Plaintiff's employment (CSUMF at ¶ 75).  The decision by the individual Board members to vote in favor of holding a hearing regarding Plaintiff's possible termination was based on Plaintiff's history of inappropriate behavior and language and his expressed disrespect for the Board (CSUMF at ¶¶ 77-81).  On March 7, 2011, the Board provided Plaintiff with a written notice of its decision, which stated:

> Your history of inappropriate behavior at Board meetings, in public and most recently directed at a Board member in front of staff is unacceptable.  Your apparent disrespect for the Board displayed by this behavior on numerous occasions and your unwillingness to abide by certain policies and directives places the Board and the Library in a position which can no longer be

> tolerated.  At a special meeting of the Board it was their unanimous decision to start the termination process outlined in the most recent Employment Agreement dated July 1, 2005.  However, the Board is willing to accept your resignation in the form of an early retirement.  Should you choose early retirement, it appears that you might be eligible to receive approximately $9,000 in compensation for unused vacation time, personal time, holidays, and unused sick time.  The Board is also agreeable to payment in an amount which is equal to your monthly salary for a term of 2 months.

The Board placed Plaintiff on paid administrative leave effective immediately (CSUMF at ¶¶ 84-85).

Plaintiff requested a hearing, and, on March 16, 2011, the Board provided Plaintiff with a written Notice of Hearing on Proposed Termination ("Notice").  The Notice provided:

> You are hereby advised that the Board of Trustees of Clapp Memorial Library has voted to proceed with a hearing on your proposed termination as Library Director based upon a pattern of conduct by you that is unacceptable to the Board of Trustees.  The hearing is specifically precipitated by the incident that took place between you and a Board Trustee on February 18, 2011, which is the most recent example of a longstanding pattern of conduct by you that is unacceptable to the Board of Trustees, as more particularly set forth in, inter alia, letters from the Board of Trustees to you dated November 13, 2007 and July 26, 2010.

The hearing was scheduled for April 14, 2011 (CSUMF at ¶¶ 87-88).  Two weeks before the hearing was to take place, on March 31, 2011, Plaintiff notified the Board in writing that he was retiring from the position of Library Director effective April 11, 2011 (CSUMF at ¶ 89).

III.    Discussion

A.    Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In the summary judgment context, "[a] factual dispute is 'genuine' if 'it may

reasonably be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990) (citations and internal quotation marks omitted)). "[A] fact is 'material' 'if its existence or nonexistence has the potential to change the outcome of the suit.'" *Jarvis v. Village Gun Shop, Inc.*, 805 F.3d 1, 7 (1st Cir. 2015) (citing *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).

A party seeking summary judgment is responsible for identifying those portions of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325). In ruling on summary judgment, the court "view[s] 'the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" *Padilla-García v. Guillermo Rodríguez*, 212 F.3d 69, 73 (1st Cir. 2000) (quoting *Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 869 (1st Cir. 1998)).

B.  Plaintiff's Section 1983 Claim

"'Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law.'"[3]  *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011) (quoting *Redondo-Borges v. U.S. Dep't of HUD*, 421 F.3d 1, 7 (1st Cir. 2005)).  A cause of action under § 1983 is comprised of two essential elements.  First, because § 1983 does not reach private actions, *Rodríguez-Garcia v. Dávila*, 904 F.2d 90, 95 (1st Cir. 1990), a plaintiff must show "that the conduct complained of transpired under color of state law."  *Santiago*, 655 F.3d at 68 (citing *Redondo-Borges*, 421 F.3d at 7).  Second, because "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred,'" *Albright v. Oliver*, 510 U.S. 266, 270 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)), a plaintiff must show "that a deprivation of federally secured rights ensued."  *Santiago*, 655 F.3d at 68 (citing *Redondo-Borges*, 421 F.3d at 7).

1.  "Under Color of State Law"

To satisfy § 1983's "under color of state law" requirement, the conduct causing the deprivation of federal rights must either constitute direct state action or be "fairly attributable to the State."  *Rodríguez-Garcia*, 904 F.2d at 95 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).  The plaintiff bears the burden of proving state action, whether direct or indirect.[4]  *Mead v. Indep. Ass'n*, 684 F.3d 226, 231 (1st Cir. 2012) (citing *Flagg Bros. v. Brooks*,

---

[3] Specifically, § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …."  42 U.S.C. § 1983.
[4] "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment."  *Barrios-Velazquez v. Asociación*

9

436 U.S. 149, 156 (1978)).  If the plaintiff fails to make a showing sufficient to establish the

existence of state action, the constitutional claim will not survive summary judgment.  *Santiago*,

655 F.3d at 68 (citing *Rendell-Baker*, 457 U.S. at 838).

      a.  <u>Direct State Action</u>

      The term "'state action' … includes action not only by states, but also by their political

subdivisions (e.g., cities and towns)."  *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 18

n.3 (1st Cir. 1999) (citing *Avery v. Midland Cty.*, 390 U.S. 474, 479-80 (1968); and *Mendez v.

Belton*, 739 F.2d 15, 18 n.1 (1st Cir. 1984)).  Plaintiff properly does not claim that the Board is

an arm of the Town government such that its actions constitute direct state action.  But that

observation alone does not end the inquiry.  The "actions of private entities can sometimes be

regarded as governmental action for constitutional purposes."  *Lebron v. Nat'l R.R. Passenger

Corp.*, 513 U.S. 374, 378 (1995) (citing *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483

U.S. 522, 546 (1987); *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Moose Lodge No. 107 v.

Irvis*, 407 U.S. 163, 172 (1972)).  "*Lebron* is the leading case on the question of whether a

nominally private organization is a government entity for constitutional purposes."  *Richards v.

City of Lowell*, 472 F. Supp. 2d 51, 71 (D. Mass. 2007).  In *Lebron*, the Court held that the

National Railroad Passenger Corporation ("Amtrak") was a government actor for purposes of

determining the First Amendment rights of citizens affected by its actions, despite its

congressional designation as a private organization.  *Id.*, 513 U.S. at 392.  Key to the *Lebron*

Court's holding was "the degree of control that the federal government had over Amtrak,"

---

*de Empleados del Estado Libre Asociado de P.R.*, 84 F.3d 487, 491 (1st Cir. 1996) (quoting
*Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).  "The ultimate issue in determining whether a
person is subject to suit under § 1983 is the same question posed in cases arising under the
Fourteenth Amendment:  is the alleged infringement of federal rights 'fairly attributable to the
State?'"  *Id.* (quoting *Lugar*, 457 U.S. at 937).

*Barrios-Velazquez*, 84 F.3d at 492, as reflected in the composition of its board, of which eight of nine external directors were federal government appointees who directed the federally-established corporation "for the very purpose of pursuing federal governmental objectives," *Lebron*, 513 U.S. at 398.  The Court summed up its rationale by stating that, where "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id*. at 400.

Lower courts have relied on the *Lebron* standard to determine whether town libraries qualify as direct state actors under § 1983.  In *Horvath v. Westport Library Ass'n*, 362 F.3d 147 (2d Cir. 2004), the Second Circuit held that the defendant library was a state actor for purposes of a former employee's § 1983 claim and reversed the district court's entry of summary judgment in favor of the library.  *Id*. at 153-54.  The court reasoned that the first two elements of *Lebron* were easily met: the Connecticut legislature created the library by special act, and "the provision of library services is a legitimate statutory objective."  *Horvath*, 362 F.3d at 153.  As to the third element, while the town did not retain the authority to appoint a majority of the library's governing body as in *Lebron*, it did appoint half of that body's members.  *Id*.  In addition, the town supplied nearly 90% of the library's funding.  *Id*.  The combination of control of one-half of the library's governing board and pervasive public funding "convince[d] [the court] that the Town maintain[ed] sufficient control over the Library to qualify it as a state actor for purposes of [the plaintiff's] claim."  *Id*. at 153-54.

In *Richardson v. Hartford Public Library*, 969 F. Supp. 2d 237 (D. Conn. 2013), the court reached a contrary conclusion, holding that the defendant library was not a state actor for

purposes of an unsuccessful job applicant's § 1983 claims and granted summary judgment to the library on those claims. *Id*. at 244. Specifically, the court found that the third element of *Lebron* was not satisfied where the governing board of the library consisted of 17 directors, of whom one was the mayor *ex officio*, three were appointed by the city, one was appointed by the board of education, and twelve were elected by the library's corporators (all of whom, in turn, were appointed by the library's governing board). *Id*. at 239-40, 244. Because the city accounted for only five of the seventeen-member board, considerably less than a majority as in *Lebron* or even one-half as in *Horvath*, the court concluded that the city did not maintain sufficient control over the library to qualify it as a direct state actor for constitutional purposes. *Id*. at 244. Additional facts pressed by the plaintiff, including that the library received over 80% of its funding from the city, that library employees participated in the city's medical insurance and pension benefit plans, and that the city's job openings website included a link to job openings at the library, did not alter the result. *Id*. at 240-41, 244.

In the instant case, Plaintiff has failed to create a triable issue of fact as to whether the Board was a direct state actor when it initiated termination proceedings against Plaintiff. While the Library was created by special law and the provision of library services "for the diffusion of knowledge and to promote intellectual, moral and physical culture" in the Town constitutes a legitimate governmental objective, the Town does not maintain sufficient control over the Board to treat it as part of the Town for constitutional purposes. The chair of the Town Board of Selectman is the only member of the seven-person Board who is a state actor. The remainder are volunteers chosen not by the Town, but by the other members of the Board. One member out of seven does not support a finding of Town control of the Board sufficient to satisfy *Lebron*. The additional fact that the Library receives ninety-five percent of its funding from the Town does

not create a triable issue in the absence of Town authority to appoint at least half of the Library's governing body.  *See Horvath*, 362 F.3d at 152 (holding that the defendant library was not a "state actor by virtue of public funding alone," where it received over 80% of its funds from the town, but only in combination with town control of one-half of the library's governing body).

Nor do any of the other facts Plaintiff presses, including that Plaintiff and other Library employees were paid by the Town, received the same pay raises as other Town employees, were subject to the Town Personnel Handbook, and were participants in the Hampshire County Retirement System, that Plaintiff was instructed to use a Town Evaluation of Performance Form to draft a self-evaluation, or that the job description the Board utilized to find Plaintiff's replacement was captioned "Town of Belchertown." (Dkt. No. 49 at p. 4).  None of these facts are material to the issue of Town control of the Board.  *See Richardson*, 969 F. Supp. 2d at 240-41, 244 (holding that the plaintiff failed to create a triable issue as to whether the defendant library was a direct state actor where the library received 80% of its funding from the city, library employees participated in the city's medical insurance and pension benefit plans, and the city's job openings website included a link to job openings at the library).  *Cf. Barrios-Velazquez*, 84 F.3d at 490 and n.1 (holding that the Asociación de Empleados del Estado Libre Asociado de Puerto Rico ("AEELA") was not a state actor for purposes of a § 1983 action by its members and affirming dismissal where, while the entity was created by state law, the Commonwealth of Puerto Rico did not have the power to appoint any of its directors, and despite the additional facts that membership in the AEELA was mandatory for all Commonwealth employees as was a 3% payroll deduction to fund its operations, that the AEELA's directors often worked on government time using government facilities and equipment, that the AEELA's employees participated in the Commonwealth's pension plan, and that all of the AEELA's

members and directors were government employees).  Accordingly, the Board's actions do not

constitute direct state action.

b.  Indirect State Action

Plaintiff's § 1983 claim still could survive summary judgment based on a demonstration

of indirect state action.  The Court has observed that no "simple" line separates "state action

subject to [constitutional] scrutiny and private conduct (however exceptionable) that is not."

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (citing *Nat'l*

*Collegiate Athletic Ass'n. v. Tarkanian*, 488 U.S. 179, 191 (1988); and *Jackson v. Metro. Edison*

*Co.*, 419 U.S. 345, 349 (1974)).  For seemingly private behavior to qualify as state action, there

must exist "such a 'close nexus between the State and the challenged action' that [it] 'may be

fairly treated as that of the State itself.'"  *Id*. (footnote omitted) (quoting *Jackson*, 419 U.S. at

351).  However, "[w]hat is fairly attributable is a matter of normative judgment, and the criteria

lack rigid simplicity."  *Id*.  "[N]o one fact can function as a necessary condition across the board

for finding state action; nor is any set of circumstances absolutely sufficient …."  *Id*. (citing

*Tarkanian*, 488 U.S. at 193, 196; and *Polk Cty. v. Dodson*, 454 U.S. 312 (1981)).  *See also*

*Gonzalez-Maldonado v. MMM Healthcare, Inc.*, 693 F.3d 244, 247 (1st Cir. 2012) (noting that

the "conditions delineated in a number of Supreme Court decisions over the years are not easily

reduced to a single formula").  Notwithstanding the lack of a precise formula, the Court has

identified certain categories in which "acts by a nominally private entity may comprise state

action – e.g., if, with respect to the activity at issue, the private entity is engaged in a traditionally

exclusive public function; is 'entwined' with the government; is subject to governmental

coercion or encouragement; or is willingly engaged in a joint action with the government."

*Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22, 26 (1st Cir. 2002) (citing *Brentwood*, 531 U.S.

at 295-96). *See also Hogan v. Bombardier*, No. 13-cv-30190-MAP, 2014 WL 4966088, at *3

(D. Mass. Sept. 30, 2014) ("The First Circuit has identified several tests for determining

'whether a private party fairly can be characterized as a state actor,'" including "the public

function test, the 'entwinement' test, the state compulsion test, and the nexus/joint action test."

(citing *Logiodice*, 296 F.3d at 26)). "It is '[o]nly in rare circumstances' [however,] that private

parties can be viewed as state actors." *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412

F.3d 1, 4 (1st Cir. 2005) (first alteration in original) (quoting *Harvey v. Harvey*, 949 F.2d 1127,

1130 (11th Cir. 1992)). "If the facts, viewed most hospitably to the plaintiff, make out a jury

question as to any one of these alternatives … the 'under color of state law' requirement is

satisfied for summary judgment purposes." *Santiago*, 655 F.3d at 69.

    Plaintiff relies on the entwinement doctrine. Pursuant to the entwinement doctrine,

"'public entwinement in the *management* and *control*' of a private entity can create a basis for

state action, but the requisite entwinement exists only when government actors manage or

exercise control over a nominally private entity." *Gonzalez-Maldonado*, 693 F.3d at 248

(quoting *Brentwood*, 531 U.S. at 297 (emphasis added)). In *Brentwood*, the Court held that the

defendant, a non-profit association that regulated interscholastic high school athletic competition,

was a state actor based on its entwinement with the state of Tennessee. The Court "stressed two

points: that the membership of the association was comprised overwhelmingly (84 percent) of

'public schools represented by their officials acting in their official capacity to provide an

integral element of secondary public schooling,' and that in substance the association (replacing

previous state school board regulation) set binding athletic standards for state schools, including

the recruiting standards at issue in the case." *Logiodice*, 296 F.3d at 28 (first quoting *Brentwood,*

531 U.S. at 299–300; and then citing *id*. at 300–01).

In the instant case, Plaintiff has presented no evidence that the Town managed or controlled the Library.  There is no evidence of Town control of the day-to-day affairs of the Library.  To the contrary, the only supported inference is that it was Plaintiff who was in control of the Library's day-to-day affairs.  Library staff reported to Plaintiff.  Plaintiff did not believe that every action on his part to address the behavior of Library patrons required Board approval.  In Plaintiff's over two decade career as Library Director, the only instance he could recall in which a member of the Board came into the Library and gave the staff direction that contradicted his was on February 18, 2011, and the countermand came from Defendant Sullivan, who was not a state actor.  Defendant Lanphear in his capacity as president and a member of the Board came to the Library often to discuss operational issues with Plaintiff, but, again, Defendant Lanphear was not a state actor.  There is no evidence that Aponte, the one state actor on the Board who Plaintiff voluntarily dismissed from this action, or any other Town official, had any involvement whatsoever in the management or control of the Library.

Moreover, the Board was responsible for all personnel decisions with respect to Plaintiff's position as Library Director.  The only Town involvement in the actions leading up to Plaintiff's resignation consisted of Aponte moving for a vote and voting in favor of providing Plaintiff notice and a hearing on his proposed termination and being present when Plaintiff was provided the notice.  The non-municipal actors on the Board also voted in favor of proceeding with Plaintiff's termination, and there is no evidence that Aponte or any other Town official controlled their votes.  In addition, in order to actually terminate Plaintiff's employment, the Agreement required a vote by six of the seven members in favor of termination following a hearing.  Aponte, the one state actor on the Board, did not have the power to singlehandedly terminate Plaintiff's employment even after a hearing.

Thus, this case is more akin to *Logiodice* than *Brentwood*.  In *Logiodice*, the defendant was a private high school in a § 1983 suit brought by a student claiming that the school had violated his constitutional rights when it disciplined him.  *Id.*, 296 F.3d at 24-25.  The First Circuit affirmed the district court's grant of summary judgment in favor of the school, holding that the school was not a state actor pursuant to the entwinement doctrine where the school was run by private trustees and not public officials, and the trustees had sole control over student discipline.  *Id.* at 32.  Of note, two of the trustees were public officials.  *Id.*  Given the lack of evidence that the state was intertwined in the management and control of the school, the additional facts pressed by the plaintiff that the state sponsored about 80% of the defendant's students and contributed about half of its budget, did not change the analysis.  *Id.* at 28.  Similarly, in this case, in the absence of facts demonstrating that the Town was intertwined in the management and control of the Library's day-to-day affairs or its personnel decisions, the Board's internal management decision to proceed with Plaintiff's termination cannot constitute state action under the entwinement doctrine, even in light of the Town's providing 95% of the Library's funding.

Plaintiff does not invoke any of the other tests for state action and with good reason, as he does not fare better under any of them.  "Under the public function test, state action inheres 'in the exercise by a private entity of powers traditionally *exclusively* reserved to the State."  *Santiago*, 655 F.3d at 69 (citing *Jackson*, 419 U.S. at 352) (emphasis added)).  Operation of a library is not such an exclusive function.  *Horvath*, 362 F.3d at 152 (citing *Hollenbaugh v. Carnegie Free Library*, 545 F.2d 382, 383 (3d Cir. 1976)).

"Under the state compulsion test, a private party is fairly characterized as a state actor when the state 'has exercised coercive power or has provided such significant encouragement,

either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State.'" *Estades-Negroni*, 412 F.3d at 5 (alteration in original) (quoting *Blum*, 457 U.S. at 1004). The "inquiry is a targeted one, with the challenged conduct at the hub of the analytical wheel." *Santiago*, 655 F.3d at 71 (quoting *Perkins*, 196 F.3d at 19).   Plaintiff has not presented any evidence that Aponte or any other Town official coerced or significantly encouraged the individual Defendants to vote in favor of initiating termination proceedings against Plaintiff.

Finally, under the nexus/joint action test, "a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity].'" *Estades-Negroni*, 412 F.3d at 5 (alterations in original) (quoting *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999) (internal quotation marks omitted) (first alteration in original)).   "The 'most salient' factor in this determination 'is the extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs.'" *Santiago*, 655 F.3d at 71 (quoting *Perkins*, 196 F.3d at 21).   As discussed above in connection with the entwinement test, there are no facts in the summary judgment record showing Town involvement in the day-to-day affairs of the Library.   The Library's receipt of public funds alone is insufficient to establish the requisite interdependence.   *Estades-Negroni*, 412 F.3d at 6 (citing *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 258 (1st Cir. 1994)).

Because no rational factfinder could conclude that Defendants acted under color of state law, Plaintiff's constitutional claim necessarily fails, and Defendants are entitled to summary judgment on it.

2.   <u>Deprivation of a Federally Protected Right</u>

Given the absence of state action, the court need not reach the second element of a §1983 claim, deprivation of a federally protected right.  Nevertheless, the court proceeds with the analysis because it provides a separate and additional basis for granting summary judgment in favor of Defendants to the extent they could be considered state actors.

The substance of Plaintiff's constitutional claim is that the Defendants violated his First Amendment rights by retaliating against him for protected speech.  "Claims of retaliation for the exercise of First Amendment rights are cognizable under § 1983." *Powell v. Alexander*, 391 F.3d 1, 16 (1st Cir. 2004) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977)).  To prove a First Amendment retaliation claim, a public employee must make three showings.  First, he must have been "speaking 'as a citizen on a matter of public concern.'" *Díaz-Bigio v. Santini*, 652 F.3d 45, 51 (1st Cir. 2011) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  "Second, under the balancing test of *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), [his] First Amendment interests in the speech must 'outweigh the government's interests as an employer in avoiding disruption in the workplace.'" *Id*. (quoting *Rivera-Jiménez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004)).  Third, he "must meet the 'burden of producing sufficient … evidence from which a jury reasonably may infer that his constitutionally protected conduct … was a "substantial" or "motivating" factor behind his dismissal.'" *Id*. at 51-52 (second alteration in original) (quoting *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir. 1993)).  A defendant may still avoid liability by proving that it "would have taken the same action against the employee 'even in the absence of the protected conduct.'" *Id*. at 52 (quoting *Mt. Healthy*, 429 U.S. at 287).

Plaintiffs can bring § 1983 suits against municipalities and other local government units, which are considered "persons" under § 1983, as well as against individual public officials, who can be named in their personal and official capacities. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978). Official-capacity suits simply "represent … another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell*, 436 U.S. at 690 n.55). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id*. at 166 (citing *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)). *See also O'Connor v. Spain*, 84 F. Supp. 3d 60, 67 (D. Mass. 2015) ("A claim against a town official in his official capacity is 'merely a claim against the Town.'" (quoting *Doe v. Bradshaw*, No. 11-11593-DPW, 2013 WL 5236110, at *4 n.4 (D. Mass. Sept. 16, 2013))). In contrast, "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Id.* at 165 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 237-38 (1974)).

"Under § 1983, municipalities can be liable for constitutional violations only if the violation occurs pursuant to an official policy or custom." *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008) (citing *Monell*, 436 U.S. at 694). Individual liability for § 1983 does not require proof of an official policy or custom; the culpability of individual public officials "must be gauged in terms of their own actions." *Id*. at 936 (quoting *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). "While the plaintiff in a personal-capacity suit need not establish a connection to governmental 'policy or custom,' officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Graham*, 473 U.S. at 166–67). The Defendants in this case are the Board and all of its members other than Aponte.

Plaintiff does not specify whether he is suing the individual Defendants in their official capacities, personal capacities, or both.  Notwithstanding this lack of clarity, the Board and the individual Defendants – in both their official and personal capacities – are entitled to summary judgment on Plaintiff's § 1983 claim.

With respect to the Board and the individual Defendants to the extent named in their official capacities, there is no evidence that any of the individual trustees acted in accordance with a Town policy or custom of terminating employees for the exercise of their right to free speech protected by the First Amendment when they voted in favor of initiating termination proceedings against Plaintiff.  Without a policy or custom, there can be no municipal liability. *Monell*, 436 U.S. at 694; *Welch*, 542 F.3d at 941.  Therefore, the Board and the individual Defendants to the extent named in their official capacities are entitled to summary judgment.

The individual Defendants likewise are entitled to summary judgment to the extent named in their individual capacities pursuant to the doctrine of qualified immunity.  The qualified immunity defense "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."  *Ashcroft v. Al-Kidd*, 563 U.S. 731, —, 131 S. Ct. 2074, 2085 (2011).  "It provides 'immunity from suit and not a mere defense to liability.'" *Díaz-Bigio*, 652 F.3d at 50 (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009)).  So long as a public official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," he or she is shielded from liability for civil damages.  *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *al-Kidd*, 131 S. Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  A right is clearly established and immunity will not issue only if "every 'reasonable official would have

understood that what he is doing violates that right.'" *Id.* at 2083 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

In the First Amendment context, the First Circuit has observed that because the *Pickering* balancing of interests is "'subtle, … difficult to apply, and not yet well defined,' … only in the extraordinary case will it have been clearly established that a public employee's speech merited constitutional protection.'" *Díaz-Bigio*, 652 F.3d at 53 (quoting *Jordan v. Carter*, 428 F.3d 67, 75 (1st Cir. 2005)). *See also Fabiano v. Hopkins*, 352 F.3d 447, 457 (1st Cir. 2003) ("'Because *Pickering*'s constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered "clearly established"' for purposes of qualified immunity." (quoting *O'Connor v. Steeves*, 994 F.2d 905, 917 n.11 (1st Cir. 1993)); *O'Connor*, 84 F. Supp. 3d at 66 ("The legal contours of the First Amendment rights of a public employee are, for better or worse, inherently murky.").

"The facts of this case do not present the sort of unusual circumstances that would support the finding of a clearly established right notwithstanding *Pickering*." *Fabiano*, 352 F.3d at 457-58. During the final year of Plaintiff's employment, there were three separate incidents in which he used profane language, including his use of the word "fuck" at the June 15, 2010 Board meeting, his statement that, "He did this for a fucking dog," at the July 9, 2010 prayer vigil, and his February 18, 2011 confrontation with Defendant Sullivan, which included the use of multiple expletives and denigration of the Board. It was only after the final, particularly egregious incident involving Defendant Sullivan – by which time Plaintiff had been warned in writing that further instances of inappropriate language and behavior could result in disciplinary action including termination – that the Board voted to initiate termination proceedings. Reasonable board members could have found these incidents supportive of the view that Plaintiff's

employment could be terminated without violating his First Amendment rights.  *Decotiis*, 635

F.3d at 48 (holding that regardless of whether defendant did in fact violate plaintiff's First

Amendment rights, which was yet to be determined, defendant was entitled to qualified

immunity because a reasonable person in defendant's position could have believed there was no

violation).  Employers have "wide discretion and control over the management of [their]

personnel and internal affairs … includ[ing] the prerogative to remove employees whose conduct

hinders efficient operation and to do so with dispatch," *Díaz-Bigio*, 652 F.3d at 53 (quoting

*Connick v. Myers*, 461 U.S. 138, 151 (1983)), and a well-established legitimate interest in

maintaining discipline.  *Id.*  Accordingly, even if the individual Defendants were state actors,

they would be entitled to summary judgment in their favor on Plaintiff's § 1983 claim based on

the defense of qualified immunity.

### 3.  Breach of Contract

Plaintiff also claims that the Board constructively discharged him in breach of the 2005

Employment Agreement (Dkt. No. 11 at ¶ 37; Dkt. No. 49 at p. 16).  Plaintiff's theory is that the

Board's failure to comply with the performance review provisions of the Agreement deprived

him of "adequate notice of the issues that would result in termination and a reasonable

opportunity to comply with the Board's expectations" (Dkt. No. 11 at ¶ 37).  Plaintiff professes

to have understood that "the performance reviews would be linked to [his] continued

employment at the library as per the … Agreement," and "would guide [him] in … improving

[his] job performance" (Maloney Aff. at ¶ 6).  Plaintiff asserts that the "potential value of

performance reviews include [sic] potential for continued employment, retirement and health

care" (Dkt. No. 49, at p. 18).

Defendants have assumed for purposes of summary judgment that the 2005 Employment Agreement was renewed under its same terms based on the conduct of the parties and was operative on the dates relevant to Plaintiff's claim (Dkt. No. 42 at p. 13; Dkt. No. 50 at p. 9). Defendants do not dispute that the Board did not provide Plaintiff with annual written performance reviews. Nonetheless, the court concludes that the Board is entitled to summary judgment on Plaintiff's breach of contract claim.

"'An employee discharged in breach of contract may ... sue as for a total breach, and recover the earnings which would have accrued to the employee for the full term of the contract, subject to be reduced by any earnings which the defendant shows that the plaintiff earned, or could have earned, in other employment.'" *Maddaloni v. W. Mass. Bus Lines, Inc.*, 422 N.E.2d 1379, 1387 (Mass. App. Ct. 1981) (quoting McCormick, Damages § 158(b) (1935)). However, the interpretation of the Agreement Plaintiff advances to support his claim that he was constructively discharged in breach of his employment agreement is untenable. "The interpretation of a written contract's terms is a question of law, not fact, and is susceptible to determination at summary judgment." *Derrig v. Wal-Mart Stores, Inc.*, 942 F. Supp. 49, 53 (D. Mass. 1996) (citing *Lexington Ins. Co. v. All Regions Chem. Labs, Inc.*, 647 N.E.2d 399, 400 (Mass. 1995)). The termination provision in the Agreement clearly contemplates the Board's right to terminate Plaintiff's employment for cause after notice and a hearing. The Agreement does not make the Board's compliance with the performance review provisions a condition precedent to the Board's exercise of its for cause termination power. Thus, the court concludes as a matter of law that the Board had the ability under the Agreement to terminate Plaintiff's employment for cause notwithstanding its admitted failure to conduct annual written performance reviews.

24

Termination for cause encompasses "failure to conform to usual standards of conduct, or other culpable or inappropriate behavior." *Klein v. President & Fellows of Harvard Coll.*, 517 N.E.2d 167, 169 (Mass. App. Ct. 1987). "[W]hether a termination was for good cause commonly presents a question for the jury." *York v. Zurich Scudder Invs., Inc.*, 849 N.E.2d 892, 900 (Mass. App. Ct. 2006) (citing *Goldhor v. Hampshire Coll.*, 521 N.E.2d 1381, 1385 (Mass. App. Ct. 1988)). However, when there is no basis in the record for a jury to infer that a termination was not for good cause, summary judgement is appropriate. *Id.* Here, there is no room for a jury to infer that Maloney's termination was for anything other than his failure to conform to the usual standards of conduct and his inappropriate behavior, including, most egregiously, the February 18, 2011, incident during which Plaintiff repeatedly swore at Defendant Sullivan while she was in the Library on Library business and denigrated the entire Board. Accordingly, because there is no basis for a jury to infer an absence of good cause, summary judgment is appropriate.

Moreover, even if the contract could be interpreted as tying compliance with the performance review provisions to the Board's ability to terminate Plaintiff for cause as Plaintiff suggests, the record does not support an inference that compliance would have changed the outcome. Plaintiff received written notice and the opportunity for corrective action in the form of the letter from Lanphear in June 2010, the very month during which his review was to have taken place. In the letter, Lanphear advised Plaintiff that the use of expletives at Board meetings and in public gatherings was "unacceptable," "unprofessional and inappropriate behavior," and that further incidents could result in disciplinary action up to and including termination. This letter preceded Plaintiff's February 18, 2011, outburst at Defendant Sullivan and warned him against the precise form of misconduct that precipitated the initiation of termination proceedings.

It seems Plaintiff could prove that the Board breached the requirement in the Agreement that it provide annual written performance reviews.  However, Plaintiff's breach of contract claim is for alleged constructive discharge in breach of the Agreement, not for breach of the performance review provisions standing alone.  Even if Plaintiff had advanced a claim solely on the basis of the Board's breach of the performance review provisions, however, he would be entitled only to damages "that are 'the equivalent in money for the actual loss [he] sustained,'" *Salvas v. Wal-Mart Stores, Inc.*, 893 N.E.2d 1187, 1217 (Mass. 2008) (quoting *F.A. Bartlett Tree Expert Co. v. Hartney*, 32 N.E.2d 237, 240 (Mass. 1941)), if any, as a result of the Board's failure to provide him with the reviews.  Such an award would be de minimis.

IV.     <u>Conclusion</u>

For the reasons stated, Defendants' motion for summary judgment is GRANTED as to both counts of Plaintiff's complaint.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge